LIZ CLAIBORNE, INC. and L.C. Licensing, Inc., Plaintiffs,

v.

MADEMOISELLE KNITWEAR, INC., individually and d/b/a The Mill Ltd. Sweater Factory Outlet; Charles Stefansky; Various John Does, Jane Does and XYZ Companies, Defendants.

No. 96 Civ.2064(RWS).

United States District Court, S.D. New York.

June 22, 1998.

Richard B. Verner, Lewin & Laytin, P.C., New York City (Harley I. Lewin, G. Roxanne Elings, of counsel), for Plaintiffs.

Kaye, Scholer, Fierman, Hays & Handler, LLP, New York City (John W. Schryber, Ross D. Cooper, Harold E. Pizzetta, III), for Defendants.

### OPINION

SWEET, District Judge.

Plaintiffs Liz Claiborne, Inc. and LC Licensing, Inc. (collectively "Claiborne"), a nationally recognized merchandiser of fashion apparel, brought this action against defendant Mademoiselle Knitwear, Inc., individually and d/b/a The Mill Ltd. Sweater Factory Outlet (collectively "Mademoiselle"), a garment manufacturer, Charles Stefansky ("Stefansky") and Shraga Newhouse, a/k/a Sy Newhouse ("Newhouse"). Claiborne alleged trademark infringement and unfair competition. Upon the trial before the Court and all the prior proceedings and the findings of fact and conclusions of law which follow, judgment will be entered in favor of Claiborne in the amount of $582,868 with costs and prejudgment interest.

The rights and obligations of suppliers and merchandisers in the highly competitive multi-million dollar fashion market for trademarked women's sweaters are complicated, developed through a course of dealing and practices and subject to mutual understanding between the participants. Here an initial relationship was accomplished by friendship, and confidence in a joint enterprise initiated in 1991. When that confidence was lost as a result of changes in personnel, procedures and market forces, the relationship deteriorated ultimately to the point of this litigation undertaken early in 1996. Given the stakes involved, the litigation has been intense and conducted aggressively and ably by skilled counsel for both sides. Under these circumstances the factual issues as resolved below are controlling.

### The Parties

Claiborne is a Delaware corporation with a principal place of business at 1441 Broadway, New York, New York. Claiborne has utilized in excess of two hundred contractors throughout the world to produce goods to its specifications and standards which goods complete in the fashion industry and bear Claiborne identification. Claiborne's sweaters were protected by its registered trademarks (the "Claiborne Trademarks").

Mademoiselle is a New York corporation and does its principal business as a garment manufacturer at 930 Flushing Avenue, Brooklyn, New York. Mademoiselle manufactured garments for Sears and J.C. Penney before undertaking to manufacture sweaters for Claiborne.

Defendant Charles Stefansky is an employee of Mademoiselle.

Shraga Newhouse ("Newhouse"), now deceased, was at the relevant time President of Mademoiselle.

### Prior Proceedings

This action was initiated by Claiborne on March 21, 1996, seeking damages for trademark infringement and unfair competition, as well as a temporary restraint and preliminary injunction. The application for preliminary injunctive relief was dropped and expedited discovery proceeded. A motion by The Blouse, Skirt Sportswear, Children's Wear and Allied Workers Union Local 23–25 (the "Union") to intervene was denied by an opinion of June 25, 1996.

Some fifteen orders were entered relating to discovery and scheduling and on September 29, 1997, an opinion was filed denying Claiborne's motion for summary judgment. See Liz Claiborne, Inc. v. Mademoiselle Knitwear, 979 F.Supp. 224 (S.D.N.Y.1997).

A bench trial was held from December 8, 1997, to January 7, 1998. Hundreds of exhibits were received and twenty-six witnesses were heard. Final submissions were made on March 27, 1998, at which time the action was considered fully submitted.

### Findings of Fact

#### I. The Course of Dealing from 1991 Until the End of 1995

Beginning in 1991, Claiborne and Mademoiselle began discussions about using Mademoiselle as a contractor and a manufacturer of Claiborne sweaters. The discussions included Mademoiselle's union status, and after entering into the relationship with Claiborne, Mademoiselle became a union shop.

By the issuance of orders in the form of cutting tickets, Claiborne conferred authority in Mademoiselle to produce Claiborne knitwear goods (mostly sweaters) for delivery to Claiborne. The cutting tickets issued by Claiborne specified the quantity of goods, the style number and trademark to be used. In addition, Claiborne prescribed in the cutting tickets the date by which Mademoiselle had to ship to Claiborne's warehouse the goods specified (the "in-warehouse" date). The in-warehouse date generally preceded, by thirty days, the date the goods were to be in the stores (the "in-store date").

The cutting tickets included requisitions not only for garments designed by Claiborne but also for garments designed exclusively by Mademoiselle or by Mademoiselle and Claiborne jointly.

Mademoiselle employed a "modular" production system under which the component parts of a sweater pass through "modules" or stations on the way to being assembled. The modules in the order of the production process were knitting, washing, cutting/slicing, sewing, and shipping.

In the knitting module, the yarn for making sweaters was knit into "panels." Panels were knit to yield eight to ten dozen garments of the same design and color, known as knitting "lots." These lots were then washed and transferred or "released" to the cutting (or slicing) module where each panel was cut into the component parts required to make a sweater. A sweater consisted of at least five components: a front, back, two sleeves and a collar, and additional components, such as pockets, were on occasion required. After the components were released from cutting into sewing, they went in bundles of parts required to make twelve units. After the component parts were assembled into a garment in sewing and passed an interim quality inspection, the garment was steam-pressed and taken to the packing stage of the sewing module where it was folded and placed into a plastic bag. After bagging, a final quality inspection of the garments was performed. Garments that passed final inspection were transferred to the shipping module where they were sorted by style, size and color and placed into twenty-four unit boxes that identified, on the carton, the garments contained within. Defective garments were referred to the production line for repair and, if the defect was repairable, proceeded through packing for final inspection again. Garments that never passed final inspection were either classified "irregular" or are discarded as waste if the defect was so severe as to render the garment unshippable even as an "irregular."

Claiborne established an on-site presence at Mademoiselle to perform the "in-line" and "final" factory inspections of all Claiborne merchandise.

From time to time in the normal course of production, Claiborne's contractors produced goods: (i) in excess of five percent of the quantity of garments authorized by Claiborne to be produced ("overruns"); (ii) that did not pass Claiborne's quality controls ("irregulars"); or (iii) past the date authorized by Claiborne ("stragglers" or "late goods"). Claiborne allowed its contractors to produce and send to Claiborne within the time period prescribed by Claiborne, five percent over or under the number of garments stated in a cutting ticket which deviations would be accepted without question or further procedure.

Claiborne required its United States contractors to report, in writing, all irregulars to Claiborne, and Claiborne authorized shipment of irregulars to. Claiborne by a "contractors Irregular/Overrun Authorization" form signed by or at· the direction of the Manufacturing. Director/Vice President of Manufacturing for the relevant Claiborne division. The contractor then shipped the irregulars to Claiborne. Claiborne's policy up until April 1993 was to accept all overruns and irregulars.

Upon receipt at Claiborne's warehouse, Claiborne conducted a final inspection of every style within every shipment of goods and audited the shipments using the Military Standard 105D, a statistical sampling plan used by the apparel industry. · A random sampling of 3–5% .of garments from each shipment were pulled for inspection (the "inspection garments"), inspected for defects, and if the number of inspection garments containing defects was equal to or less than the acceptable level, the entire shipment was accepted as first quality. If the number of inspection garments containing defects was above the rejection level, the entire shipment was rejected, and corrective action was taken.

## II. *Claiborne's Knowledge of the Garments Produced by Mademoiselle*

Mademoiselle maintained a computerized production tracking system that reported on a module-by-module basis. The system generated at the final stage of each module an "extract file listing" that showed the quantity of "garments" (*i.e.*, the quantity of component-part bundles required to make one sweater) input into the computer as the amount released from each module (*i.e.*, knitting extract file listing, washing extract file listing, cutting or "slicing") extract file listing, and packing extract file listing. The extract file listing for the knitting and cutting modules contained production data transposed from daily summary sheets prepared ·by that Module's manager relative to the knitting lots processed.

Mademoiselle prepared and submitted to Claiborne weekly "work-in-process" reports showing, *inter alia*, the quantity of garments ordered that were in production and the scheduled "ship date." These reports documented the quantity and progress of the garments Claiborne ordered from Mademoiselle which indicated whether shortages or overages would result from any given production run relative to the quantity of first-quality garments ordered, or whether production would be completed before or after the ship date designated in the order as originally issued or as amended. Mademoiselle also reported to Claiborne the quantity of yarn purchased to fill Claiborne's orders.

Jack Listanowsky ("Listanowsky"), then Vice President of Manufacturing and Operations, represented Claiborne in developing the relationship with Mademoiselle which started in the fall of 1991. In 1992 Claiborne issued cutting tickets to Mademoiselle calling for the production of 1.5 million units in the period from June 1992 to May 1993.

## III. *The Decline Of the Business Relationship*

Mademoiselle began to develop financial problems in 1992, resulting in a Chapter XI filing and reorganization. Mademoiselle borrowed $175,000 from Claiborne to upgrade its machinery, purchased high-speed knitting machines for over $1 million financed by the seller, borrowed $200,000 from Claiborne to purchase a yarn twisting machine, and Clai-

borne financed the yarn which Mademoiselle used to manufacture the Claiborne units. Newhouse, the president of Mademoiselle, anticipated a continuation of the Claiborne business at the same level as during the first year of the relationship based upon his conversations with Listanowsky.

During the 12 to 14 month period prior to January 1, 1994, Claiborne decentralized with each division becoming its own profit center. Under this reorganization, individual division officials were compensated, in part, based upon the profits that their divisions earned on the garments sold. Following decentralization, Claiborne's divisional officials reported to Listanowsky that there were performance problems with Mademoiselle. Listanowsky investigated these charges and found them to be unsubstantiated and inconsequential. However, the profit margin on goods produced by union labor in the United States was less than what could be realized on goods made in non-union shops abroad. In 1994 the volume of units ordered by Claiborne from Mademoiselle fell. Newhouse protested this diminution of cutting tickets and sought an increase in the Claiborne orders. By early 1995, Claiborne increased the allocation of production to non-union factories off-shore.

Listanowsky sought to reassure Newhouse that the Claiborne business would hold up, and Newhouse continued to press for reassurance and additional orders. Listanowsky who had been at Claiborne for fourteen years serving as executive vice president since 1991, had a close relationship to Newhouse who employed his wife. At the end of 1994, Harvey Falk was replaced by Paul Charron as Chief Executive Officer of Claiborne. Listanowsky left Claiborne in April of 1995 to become a vice president of The Limited with responsibility for procurement of goods.

Claiborne was a member of the employers association, the New York Skirt and Sportswear Apparel Association, Inc., which had a collective bargaining agreement with the Union. The Union during this period sought

reassurance from Claiborne that it would continue to obtain production from United States manufacturers. In an April 1995 letter, Claiborne confirmed its oral statement that it would order 50,000 sweaters a month from Mademoiselle from June 1995 through June 1997, continuing a similar commitment which had expired on May 31, 1995.

In mid–1995, Mademoiselle and Claiborne initiated a proposal for manufacturing sweaters using Mademoiselle's newly patented cotton lyra blend technology, a proposal which gained acceptance at Claiborne in September 1995, notwithstanding the problems of timely delivery and quality which had been the subject of discussions. However, the negatives concerning Mademoiselle's performance outweighed the positives, and the proposal was abandoned. By letter of November 16, 1995, Claiborne advised Mademoiselle that "these results are completely unsatisfactory and do not represent a basis upon which the existing relationship can continue." Discussions to resolve the impasse were held without resolution.

On December 4, 1995, the Union filed a complaint seeking arbitration to enforce its perceived commitment by Claiborne to order units from Mademoiselle.[1]

On December 5, Mathew Gluckson, a Claiborne Vice President of manufacturing, noted in his diary a 3–4 months exit strategy involving Mademoiselle. When testifying subsequently he had no recollection concerning the entry or any discussion which gave rise to it. Sometime in December the present outside counsel for Claiborne was retained. On December 28, 1995, enforcement personnel of Claiborne received an anonymous telephone call from a person said to be a contract sewer to the effect that Mademoiselle was selling Mademoiselle garments with Claiborne labels at a store on Long Island on Glen Cove Road. An investigation into unauthorized sales by Mademoiselle was launched which culminated in the filing of this action in March, 1996.

---

1. The arbitration took place on January 4, 10, 11, 31, February 1, 29, March 20, 21, 25 and resulted in an Opinion and Award on May 21, 1996, which enforced the earlier Claiborne undertaking which it had sought to terminate on the grounds that Mademoiselle failed to perform "at satisfactory levels of quality and timeliness."

On April 24, 1996, letters from Claiborne's counsel abrogated any authority of Mademoiselle to sell any Claiborne merchandise to third parties.

## IV. *The Claiborne Policy Permitting Sales by Mademoiselle to Third Parties*

The procedures and practices with respect to the disposition of overruns and irregulars (including stragglers) was set forth in the contractors manual issued by Claiborne and distributed to Mademoiselle (the "Contractors Manual"). During the period from the beginning of their relationship through November 1995, Mademoiselle offered and Claiborne accepted all overruns and irregulars reported by Mademoiselle as provided in the 1991 and 1993 version of the Contractors Manual. This was consistent with Claiborne's practice with respect to all its manufacturers.

The sell-off of excess goods by a manufacturer was subject to three criteria, namely, that, as of the time such goods were presented for retail sale, the excess goods were (i) not current regular-line goods, (ii) appropriately marked (to correspond to quality) and (iii) the subject of an unexercised or relinquished "right of first refusal."

These excess goods were finished garments that did not count towards fulfillment of Claiborne's purchase order and were overruns, irregulars, or stragglers, as described above.

In April of 1993 a modification was made to Claiborne's practice to accept all excess goods. The modification consisted of the so-called "200–piece requirement" before any excess goods would be accepted. Claiborne concluded that the cost of processing small quantities of irregulars, less than 200 pieces, militated against acquiring these smaller amounts which would then be disposed of by the manufacturer as excess.

Listanowsky, the originator of the 200–piece requirement, testified that it applied to Mademoiselle, testimony which was consistent with Mademoiselle's status as a major supplier. Claiborne's witnesses testified that the policy did not apply to Mademoiselle because Claiborne was financing Mademoiselle's yarn. However, no testimony was offered as to the mechanics of this financing to establish that Claiborne owned the yarn and therefore all the units. The testimony and the logic of the relationship established that the 200–piece requirement was applied to Mademoiselle although there is no direct written evidence on this issue, either way. Similarly, the 200–piece requirement to make any sense had to be, and was, applied to a particular style, not individual lots.

Excess goods could be sold by Claiborne contractors as long as the Claiborne trademarks were protected by alteration of the identification of the goods and the timing of the sales. The contractor was required to (1) cut notches or mark the neck label (which bears the Claiborne trademarks), remove the hang-tags, and in the case of irregular goods, mark the goods as irregular; and (2) wait a period equal to six months after the in-store date ("waiting period").

The waiting period prevents a contractor's discounted irregulars or overruns from being offered for sale at the same time first quality Claiborne goods are being offered for sale by Claiborne's customers or outlet stores. The Contractor's Manual refers to a waiting period of three seasons. At the time the Contractor's Manual was drafted, Claiborne had six selling seasons lasting two months each. Claiborne currently has four selling seasons lasting three months each. Whether couched as two or three selling seasons, the time period has remained consistent at six months and is a common industry standard. Listanowsky's testimony to the contrary was not credible.

Newhouse testified that this policy concerning excess goods was modified early in November 1995 when Richard Owen ("Owen"), a Claiborne Vice President of Manufacturing, advised him to sell all its excess inventory. Owen does not recall such an authorization, and there is no written evidence of such a change in policy, nor any explanation as to why such a change would be in Claiborne's interest.

Mademoiselle has suggested that the Owen authorization is confirmed because thereafter Mademoiselle did not submit an excess offer-

ing to Claiborne, and this inaction was never questioned by Claiborne. However, excess garments were accepted by Claiborne in late November 1995, at the time of the alleged Owen authorization. Thus, there is a four-month span between the receipt of excess goods by Claiborne in late November 1995 and the filing of this action in late March 1996. A four-month span between receipt of excess goods and the next excess goods offering was the course of dealing between the parties in prior years.

The Newhouse testimony, the only evidence of the Owen authorization, constituted a self-serving justification for any irregulars and excess inventory produced by Mademoiselle post–1995, and is not documented or credited.[2]

### V. *The Investigation*

After the anonymous telephone call on December 28, 1996, Claiborne sought to determine the accuracy of the allegation and to investigate any unauthorized sales by Mademoiselle. A link is sought to be made by Mademoiselle between the averred Owen authorization of early November and the anonymous call, seeking an inference that Owen may have been the caller and by the authorization sought to lure Mademoiselle into unauthorized sales. There is no credible evidence upon which to base such an inference and the link must be classified as speculation. On the state of this record, the anonymous caller remains anonymous.

### A. *The Mademoiselle Outlet Stores*

Security personnel for Claiborne visited the Mademoiselle Mill Ltd. Sweater Factory Outlet in Long Island on three occasions and observed between 500 and 750 sweaters hanging on racks which bore Claiborne hang-tags and labels. Some sweaters, identical to the Claiborne sweaters, bore hang-tags and labels with the word "Mademoiselle."

Claiborne personnel then visited the Mademoiselle factory outlet store in Brooklyn and observed approximately 1,000–1,200 Claiborne sweaters and also sweaters with "Yarn Works" trademarks that were displayed side-by-side with identical sweaters bearing the Claiborne Trademarks.

Several sweaters were purchased during these visits. In addition to "Mademoiselle/Yarnworks" sweaters being sold next to identical Claiborne-labeled sweaters, other sweaters purchased at Mademoiselle's outlet stores were unauthorized in that styles nos. 20420187, 26610586, 35510280, 64510382 were never reported or offered to Claiborne in the amount offered at the store. Other sweaters purchased at Mademoiselle's outlet stores, nos. 2033470, 26460182, 26560780, 60460081, were of the same styles offered to and accepted by Claiborne. At least two of the sweaters purchased on January 4, 1996, nos. 26560780 and 26610586, were being offered less than three months after the in-store dates of October 2, 1995 and October 30, 1995, respectively.

### B. *Mademoiselle Sales And Offers To Investigation*

Claiborne next hired James F. Perrone ("Perrone") of Colt Investigations, an investigator with twenty-four years experience, thirteen years with the New York City Police Department and Charlotte City Police, and eleven years as a private investigator. Perrone was engaged to conduct an investigation into the extent of Mademoiselle's production, offer for sale and sale of unauthorized Claiborne merchandise.

Perrone contacted Mademoiselle requesting to speak with someone regarding the purchase of sweaters and was referred to Stefansky, who was designated as the Mademoiselle representative for large order sales. Stefansky stated in a recorded conversation that Mademoiselle could in the future supply Claiborne sweaters on a monthly basis and that "I could make [CRAZY HORSE brand sweaters] for you. Meaning I have a lot that's label-less, they have no labels on them. I could put the Crazy Horse label on them for you, if you want." In addition, Stefansky stated:

> If I know in the future that you're a more or less reliable source, when we knit the goods, I can send you a sample of the

**2.** The Estreicher hearsay repeating a Newhouse statement suffers from the same fault.

knitted goods. And I'll tell you, hey, I'm doing this for Claiborne for 20,000 pieces, do you want me to stick in 5,000 pieces for you.... This way, you tell me yes, I'll go ahead and continue the production, and I'll call it an overrun and ship it straight to you.... [T]his is the philosophy of the floor.... You getting stuff that we would reject, you getting stuff that we overrun and you getting cancellations.... I definitely cannot guarantee you 50,000 a month, every month Claiborne. But I could tell you that we still have some nice amount of inventories now, and we are doing production every day ... and you come back and say, hey, Charlie, I have a client, this is good, this style would go good, I can take 50 dozens of this or even 30 dozens—it doesn't even have to be big—I'll tell the knitting manager, please add to the plan X amount of dozens.

Stefansky added that he had 2,000 pieces of a "very expensive vest," style 26620887 which Claiborne had cancelled on February 15, 1996, that he could do future orders once production started for a Claiborne style, that he could send a sample by UPS and on request could produce extras for sale to the investigators, that Mademoiselle could in the future produce more units of a Claiborne sweater, style 64561180 and that Mademoiselle has 600 pieces of "Lizsport" Claiborne sweater, style 64561180 for $16 each.

Jack Vail ("Vail"), another Colt employee, posing as a third party wholesaler, also recorded conversations with Stefansky. Stefansky offered Claiborne sweaters to Vail which currently were in production and indicated these sweaters could be available in as little as thirty days. Vail testified that Stefansky told him the following:

If we had ... the cash that [Stefansky] could provide up front, that he could do what he termed a future or order for the future. And [Stefansky] explained to me that Claiborne had different productions that they would send in, that normally two to three months prior to the actual production beginning, that he would basically—or they would have arranged with Claiborne what they were going to be producing, and that once the production started, he could

send through UPS a sample of what they were producing, and that if I wanted to purchase a larger quantity or a quantity of that particular sweater, then he could produce whatever I needed.

Perrone then purchased from Mademoiselle, from January 11, to March 8, approximately 226 Claiborne garments comprising 18 different styles. None of the sweaters sold to Perrone were rejected by Claiborne, the style of the Claiborne garments had not yet been offered for sale to the consumer, and Mademoiselle had not completed shipping to Claiborne. The garments were not marked as irregulars.

### C. *Top of the Line*

Stefansky and another Mademoiselle employee, Morris Hassan ("Hassan"), owned "Top of the Line," an outlet store in East Brunswick, New Jersey which was open for the Christmas 1996 season and closed in February or March 1997.

According to former Top of the Line employees, Claiborne sweaters, together with other name brand sweaters supplied by Mademoiselle, including GAP, Mademoiselle and Limited brand sweaters, were mixed together in boxes, all with a return address of Brooklyn, New York. Mademoiselle was the only consignment supplier of brand name sweaters, and when totalling purchases from Top of the Line, the number of Mademoiselle consigned sweaters sold, including L.L. Bean, Eddie Bauer, Mademoiselle and Claiborne, were tracked by using the same button the cash register—number 5. In January or February 1997, Top of the Line offered for sale approximately six Claiborne sweaters, style 20729580. This style sweater was produced exclusively by Mademoiselle for sale by Claiborne to Macy's and had an in-store date of February 1, 1997. Top of the Line also offered for sale and sold approximately 12–24 Claiborne sweaters, style 26460385. These sweaters bear a Union label with the designation S96, the factory designation for Mademoiselle.

### VI. *The Integrity of the Evidence*

All the sweaters purchased in the investigation became part of the discovery process

and were identified and admitted into evidence. Although the links of the chain of custody were not tightly forged, Claiborne established by a preponderance of the evidence that the custody of the Mademoiselle sweaters purchased by Claiborne was adequately maintained. The sweaters were obtained, either directly from Mademoiselle or from Mademoiselle's factory outlet stores. The sweaters purchased by Claiborne in-house security personnel were maintained in the custody of the investigators in a locked room until the sweaters were transferred to Claiborne's counsel where they were placed in a locked storage room monitored by a paralegal employee assigned for that purpose.

The sweaters purchased by Perrone were received at Colt Investigations from Mademoiselle and were maintained and counted under supervision of Colt staff. The sweaters were appropriately tagged and identified by the standard procedures used in other investigations and subsequently transferred to Claiborne's counsel. When the sweaters were transported for inspection after their arrival at the office of plaintiff's counsel, an investigator or member of counsel's staff traveled with the sweaters and maintained custody and possession of the evidence at all times.

When the defense inspected the sweaters shortly after the action was filed, the sweaters were presented for Mademoiselle's inspection in rows with evidence tags attached. After the inspection, the sweaters were disorganized, and some evidence tags had been removed. Using written inventories, the goods were reassembled as previously.

Mademoiselle alleged that Claiborne's counsel, Ms. G. Roxanne Elings ("Elings"), purchased three Claiborne sweaters from Claiborne's outlet stores which tainted the other Claiborne sweaters purchased from Mademoiselle. Mademoiselle first raised the issue of the sweaters purchased by Elings at the outset of this action. Less than two months after this action was filed, these sweaters were identified to Mademoiselle's counsel and were repeatedly offered for Mademoiselle's inspection. Mademoiselle—which has the burden to prove its affirmative defense of unclean hands—never called Elings or any other witness in support of that defense.

Claiborne's counsel maintained Claiborne sweaters from other cases in its evidence room. The eight non-Mademoiselle produced Claiborne sweaters were kept in Claiborne's counsel's evidence room in a separate container and were not commingled with the evidence sweaters manufactured by Mademoiselle. Moreover, the number of actual sweaters in the inventory attributable to Mademoiselle never changed from first count to last. The testimony concerning the chain of custody met plaintiff's burden of proof.

## VII. *The Infringement*

The investigation described above established that Mademoiselle made a number of offers to sell Claiborne garments to Perrone in excess of 200 pieces: 2,000 pieces of a "very expensive vest," style 26620887; (ii) 600 pieces of "Lizsport" Claiborne sweater, style 64561180 for $16 each; and (iii) 5,000 pieces, on an ongoing basis, a quantity Mademoiselle could "stick in" to a normal Claiborne sweater production run. These offers were express offers to counterfeit Claiborne sweaters and a violation of the 200 piece requirement.

While no witness testified to observing more than 200 pieces of any one style sweater in Mademoiselle's factory outlet store and Claiborne employees did not see Mademoiselle selling in excess of 200 pieces in visits to these stores, this did not constitute evidence that Mademoiselle only sold less than 200 pieces of any one style.

The almost complete absence of any Mademoiselle records as to its production, inventory and disposition of garments constitutes powerful evidence to support the effort of Claiborne's expert, Basil Imburgia ("Imburgia") to reconstruct the pattern of Mademoiselle's conduct with respect to the production and disposition of unauthorized and therefore infringing garments.

Each of the sweaters in evidence was offered for sale and/or sold in violation of Claiborne's marking requirement which called for the removal of hang-tags and cut-

ting or removal of Claiborne labels. Listanowsky at deposition testified that labels of excess goods sold to third parties had to be stamped or cut but at trial he maintained that Mademoiselle need only mark the excess goods in the same manner as Claiborne marks goods for sale to its retail customers and outlet stores. However, this latter testimony is inconsistent with the purpose of the overruns/irregulars policy which sought to permit contractors to recoup their costs by selling small amounts of irregulars or unintentionally produced overruns that were purchased by Claiborne under circumstances permitting Claiborne to protect its goodwill and the reputation of its trademark.

Claiborne required that goods inspected at Claiborne's warehouse be marked differently than those goods not inspected at Claiborne's warehouse to ensure that the consumer who is dissatisfied with the quality of the excess goods does not impart that dissatisfaction to Claiborne or return the goods to Claiborne's retail customers, outlet stores or Claiborne.

In addition, each of the evidence sweaters in a style produced by Mademoiselle within the six-month period preceding institution of this action and known to have been offered for sale and sold by Mademoiselle, was sold in violation of Claiborne's waiting period of six months after the in-store date.

According to Mademoiselle and Listanowsky, Claiborne "made for outlet" goods could be sold even prior to Claiborne's retail outlets and Mademoiselle was permitted to sell the same sweaters prior to or within days of the sweater being received by Claiborne's retail customers, or sell the same sweater directly to Macy's that it had just shipped to Claiborne for delivery to Macy's. Such a position would gut any overruns/irregulars policy, was not believable, and was offered to justify the unauthorized sales.

This uncorroborated evidence was contradicted by the testimony of Claiborne witnesses on this subject which was credible and consistent with the rationale for the waiting requirement, which is to prevent a contractor's discounted irregulars or overruns from being offered for sale at the same time first quality Claiborne goods are being offered for sale by Claiborne's customers or its outlet stores. The date a retail customer received a sweater was not tied to the first day, or even the first week, of the season for which the sweater is produced and there were many styles of sweaters for which the in-store date is just days before or even after the close of the season for that style. The six month policy was the relevant time period.

## VIII. *The Unfair Competition*

The investigation revealed as found above that Mademoiselle produced and sold Mademoiselle-labeled garments in its factory outlet stores which were in fact Claiborne garments. Mademoiselle hypothesized that Mademoiselle brand sweaters must have been placed next to Claiborne sweaters by customers. Mademoiselle's witnesses conceded the Mademoiselle brand look-alike garments were production Claiborne sweaters that, for one reason or another, could not be sold as first quality, and that those sweaters were designated and labeled as Mademoiselle brand garments. Mademoiselle failed to rebut the evidence presented at trial that it falsely designated the look-alike sweaters as Mademoiselle brand sweaters and sold them immediately adjacent to and intermixed with other Claiborne brand garments. In addition, the Yarnworks and Mademoiselle labels are not generally recognizable brand names.

Mademoiselle's witness and former director of Quality Assurance for Claiborne, Burt Lieberman ("Lieberman"), could not tell the difference between the Mademoiselle brand sweater and the corresponding Claiborne brand sweater when shown side by side at trial. The sweaters are virtually identical. Indeed, according to Newhouse, to the extent look-alike Mademoiselle brand sweaters were found side by side among Claiborne labeled sweaters, assumedly mistakenly placed there by customers, despite the fact there were signs clearly identifying the Claiborne section, thus establishing customer confusion. The testimony of the Claiborne witnesses as to the events surrounding the display and acquisition of the Mademoiselle look-alikes was consistent and credible.

In addition, the investigation established that Top of the Line, the store operated by Stefansky and former Mademoiselle employee Morris Hassan, offered for sale and sold Claiborne sweaters that were manufactured by Mademoiselle. No invoices, inventories, packing slips, notes, or memoranda reflecting Top of the Line's purchase of Claiborne sweaters from entities other than Mademoiselle were produced to counter the credible evidence of these disinterested witnesses.

The first "business record" asserted by Mademoiselle is the consignment agreement signed between Mademoiselle and Top of the Line. However, this document makes no mention of the brands of sweaters to be consigned from Mademoiselle to Top of the Line. The second "business record" asserted by Mademoiselle is alleged to be the "packing lists" that accompanied Mademoiselle's shipment of the sweaters to Top of the Line and the return of sweaters to Mademoiselle. These lists did not specifically identify Claiborne sweaters by brand name.

Any probative value of these packing lists is far outweighed by the direct testimony and evidence offered by Claiborne showing that: (i) all name brand sweaters, including those admittedly consigned by Mademoiselle to Top of the Line, along with Claiborne sweaters, came to Top of the Line from an address in Brooklyn; (ii) all name brand sweaters, including those admittedly consigned by Mademoiselle to Top of the Line along with Claiborne sweaters, were rung up on the same key number 5 on the cash register at Top of the Line; (iii) all name brand sweaters, including those admittedly consigned by Mademoiselle to Top of the Line along with Claiborne sweaters, were invoiced by Top of the Line to Mademoiselle; and (iv) the 1997 Macy's sweater, which was produced for Claiborne only by Mademoiselle and only for sale to Macy's, was being sold at Top of the Line at the same time it was being sold at Macy's. These facts establish Mademoiselle as the source of the Claiborne sweaters sold by Top of the Line.

## IX. *The Extent of the Unauthorized Use*

By appropriate demand Claiborne sought Mademoiselle retail sales journals, physical inventory reports, perpetual inventory reports and production reports in an effort to determine the number of units of Claiborne's goods not received by Claiborne. One inventory report of October 31, 1995 was produced as well as incomplete production records and extract reports (weekly reports of garments produced out of each production module).

In the absence of any sales records, journals or tax returns which could establish actual sales by Mademoiselle of particular styles, Claiborne sought to establish the number of unauthorized sales by the difference between the number of units produced by Mademoiselle and the number received by Claiborne. Under all the facts found above, it is reasonable to infer that such a difference is attributable to unauthorized garments.

Claiborne and its expert Imburgia used two methods to determine this difference, the knitting extract reports and the October 1995 inventory. Neither was accurate for the entire period because the knitting extract reports covered only 41% of the styles ordered by Claiborne, and the inventory covered only a ten-month period. The respective differences, and thus inferred unauthorized sales, were 42,322 units based on the knitting extracts and 62,494 for the inventory period.

Mademoiselle's knitting extract reports tracked, on a weekly basis, the quantity of garments coming out of each of its four production modules—knitting, washing, slicing/cutting and sewing. Extract reports for the sewing module only existed for 1993. Subsequent to 1993, goods were not reported as they left the sewing module, but were next reported upon exiting packing and shipping.

The cutting extract reports, or the number of garments exiting the cutting/slicing module, constituted the most accurate reports in the latter phase of production. While the packing extract reports were for the last module, the packing extract reports were, for many styles, either higher or lower than the knitting, washing and cutting. Garments reported in the cutting extract reports were not yet sewn and might be damaged and discarded in the sewing phase. Imburgia, nonetheless, relied upon the cutting extract

reports because they were the best production records he had to work with and industry practice indicated that the number of garments discarded in the sewing phase ("post-cutting waste") would be minimal—less than one percent.

In comparing the number of sweaters produced but not received to the total units cut, on a style by style basis, Imburgia concluded that for half of the styles included in the analysis, the percent of "shortfall" was between five and fifteen percent. Since the percentage of "shortfall" was significantly greater than the industry standard for post-cutting waste, Imburgia concluded that post-cutting waste was not the reason for the disparity between the garments produced by Mademoiselle but not received by Claiborne.

Imburgia also reviewed the October 1995 inventory to determine, on a style by style basis, the number of Claiborne goods on hand at Mademoiselle as of October 31, 1995. Again, using Claiborne's receiving records, Imburgia deducted, on a style by style basis, the number of Claiborne garments actually received by Claiborne. The results of this calculation indicated Mademoiselle produced over 60,000 Claiborne sweaters which were not received by Claiborne.

Imburgia was aware that Mademoiselle claimed that the October 31 inventory was inaccurate. However, he used this document because: (i) it was the only perpetual inventory document received from Mademoiselle; (ii) the comptroller for Mademoiselle testified at deposition that Mademoiselle used this report when determining how many units he would offer to Claiborne as overruns or irregulars; and (iii) Imburgia tested the reason Mademoiselle claimed for the inaccuracy of this report and did not agree with its contention. In essence, Mademoiselle claimed the October 1995 inventory was inaccurate because the packing extract reports, which are purportedly inaccurate, generated the October 1995 inventory. Yet, when Imburgia tested this theory by looking at the packing units per style less the receiving units per style through the date of the October 1995 inventory, the resulting number of units did not match what was reported in the October 1995 inventory. Some of the styles were significantly higher while other styles were significantly lower. Because the October 1995 inventory did not match the packing extract reports and since Mademoiselle claimed to take annual physical inventories of all sweaters and quarterly physical inventories of Claiborne sweaters, Imburgia concluded that the October 1995 inventory was more likely than not updated with the physical counts, thereby making it a more accurate document.

Mademoiselle did not produce all documents that might have been expected to show the inventory of finished garments maintained by Mademoiselle. Initially, when asked to produce documents showing inventory, Mademoiselle claimed "they do not. possess any comprehensive listing of inventory it [sic] currently has or at any time since January 1993 had in inventory." Admission Requests Nos. 10, 11 and 12 are as follows:

10. Mademoiselle does not currently possess any notes, inventory and/or list regarding Claiborne merchandise it currently has or at any time since January 1, 1993 had in inventory.

11. Mademoiselle has never created any notes, inventory and/or list referring to or regarding Claiborne merchandise it currently has or at any time since January 1, 1993 had in inventory.

12. Mademoiselle has never created, developed and/or devised in any computer database or on any computer disc, any notes, inventory and/or list referring to or regarding Claiborne merchandise it currently has or at any time since January 1, 1993 had in inventory.

After being confronted with the October 1995 inventory from their own files, Mademoiselle changed their response to "we admit such documents may exist, but whatever exists has been produced." The Mademoiselle comptroller testified that at the end of every year, he would receive a written document showing the available inventory, "would see what was available, see what the inventory was, give it a value, and I wouldn't save that information ... [because] inventories were basically constantly changing. There was a low inventory, and there was no reason for me to save [such a document]."

He testified that the October 1995 inventory was a perpetual report which shows goods that are transferred in from production less goods invoiced and that the October 1995 inventory is not accurate because it is not reduced by goods sold from Mademoiselle's outlet stores or given to charities. However, there was no records of goods given to charities nor charitable deductions claimed, and no record of the sales to Mademoiselle's outlet stores.

Stanley Holcdorf, the production manager for Mademoiselle and a credible witness, testified about Mademoiselle's computerized inventory tracking system as it relates to yarn purchased and maintained by Mademoiselle and as it relates to the production process from knitting to washing to slicing. According to Mademoiselle, the system is too time consuming to maintain as to the finished garments so that it relies solely on physical counts, which counts were not produced because Mademoiselle claims to discard them upon obtaining the results. However, the production manager testified he would conduct an autopsy on 70–75% of the styles produced by Mademoiselle by going "into the screen and see how much I put in against what was shipped, take off any inventory, come up with what I call MIAs or missing in action."

## X. *The Claiborne Motivation.*

The facts found above create a strong inference that Claiborne wished to terminate the relationship with Mademoiselle. However, Claiborne also sought to insure that Mademoiselle was complying with its policies designed to protect its trademarks—with or without an anonymous call. As found above, there was a basis for bringing the infringement action.

The existence of an improper motive on the part of Claiborne arising out of a desire to terminate the six year contract that Mademoiselle maintained had been forged with Claiborne was not established. Newhouse did not produce any writing made before this lawsuit was filed in 1996 to complain to Claiborne that Claiborne was in breach of its alleged six year commitment, even though the breach supposedly began as early as 1994. Newhouse conceded that during Mademoiselle's first Chapter 11 proceeding he never disclosed, either in the disclosure statement or elsewhere, to Mademoiselle's creditors the existence of the supposed six year production commitment from Claiborne—a commitment that would in theory have generated at least eight million orders, or approximately $140 to $200 million in total revenue to Mademoiselle.

In addition, Newhouse testified that the alleged commitment was to last for "[n]o less than six years" and that "it's not written."

In addition, the evidence at trial established that Claiborne did not know the quantity of Mademoiselle's outlet store sales, or that Mademoiselle was otherwise offering and selling Claiborne sweaters in violation of the authority conferred by Claiborne prior to December 1995.

## CONCLUSIONS OF LAW

### I. *Trademark Violation*

#### A. *Lanham Act Section 32 Violation*

Section 32 of the Lanham Act states that "any person who shall, without consent of the registrant—(a) use in commerce any reproduction, counterfeit [or] copy ... of a registered mark in connection with the sale [or] offering for sale of any goods ... in connection with which such use is likely to cause confusion ... shall be liable in a civil action by the registrant." 15 U.S.C. § 1114(1). Therefore, to establish liability Claiborne must prove by the preponderance of the evidence that: (1) the mark was registered; (2) Mademoiselle did not have consent to use the mark; (3) Mademoiselle did use the mark in commerce in connection with either the sale or the offering for sale of goods; and (4) the use of the mark was likely to cause confusion. There is no dispute that the marks are validly registered.

Claiborne has proven by a preponderance of the evidence that (1) Mademoiselle did not have consent to use the Claiborne trademarks on unauthorized garments; (2) Mademoiselle used the Claiborne trademarks in commerce in connection with either the sale or the offering for sale of goods; and (3) the

use of the Claiborne trademarks is likely to cause confusion.

### 1. Sale and Offer to Sell Without Consent

Mademoiselle breached two types of authority conferred by Claiborne: (i) the authority to produce Claiborne merchandise; and (ii) the authority to sell Claiborne merchandise overruns and irregulars to third parties.

■ The Lanham Act provides that merely "offering for sale" a good is sufficient to find liability, and therefore Mademoiselle's offer to produce and sell garments bearing Claiborne's trademark constitutes a violation of the Lanham Act. *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 43 U.S.P.Q.2d 1616, 1618 (9th Cir.1997) (Section 32 of the Lanham Act "does not require that the defendant be in possession of counterfeit goods at the time of the offer or that the defendant make an actual sale. An offer to sell without more will suffice to establish liability"); 15 U.S.C. § 1114(1).

■ Additionally, an adverse inference can be drawn against Mademoiselle from its failure to produce Stefansky or any other witness to these offers. *See N. Sims Organ & Co. v. SEC*, 293 F.2d 78, 80–81 (2d Cir.1961) ("[T]he accepted rule [in a civil trial] is that failure to explain facts and circumstances warrants the inference that [the party's] testimony would have been adverse.").

### 2. Likelihood Of Confusion

■ To succeed on a claim under the Lanham Act, Claiborne must show a "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978); *Nikon Inc.*, 987 F.2d at 94.

Here, Mademoiselle infringed Claiborne's trademarks primarily with identical garments. Accordingly, likelihood of confusion was unavoidable. To the extent otherwise, the Second Circuit in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961) set forth following factors to consider:

> the strength of the make; the degree of similarity between the two marks; the proximity of the products; the likelihood that the prior owner will bridge the gap; actual confusion; and the reciprocal of the defendants' good faith in adopting its own mark; the quality of defendants' product; and the sophistication of the buyers.

Applying the *Polaroid* factors to the facts at hand illustrates that likelihood of confusion is inevitable. There is no dispute over the strength of the Claiborne trademarks and, as such, "plaintiff deserves broad protection against infringement." *Id.* The proximity of the products factor focuses upon whether the merchandise competes. *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir. 1993). Here, the unauthorized Claiborne merchandise is sold in direct competition with genuine Claiborne merchandise. Mademoiselle obtains the benefit of Claiborne's advertising, although they do not pay for it. Thus, analysis of this factor favors a finding of infringement.

The Second Circuit has taken two approaches about the quality of a defendant's product: (1) an inferior quality product injures the senior user's reputation because people may think they come from the same source; or (2) a product of equal quality promotes confusion that they come from the same source. *Id.* at 95; *Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 491 (2d Cir.1988). Applying either approach here weighs in favor of Claiborne.

In sum, analysis of the *Polaroid* factors illustrates an unquestionable likelihood of confusion. Thus, Mademoiselle is liable for trademark infringement.

### B. Lanham Act Section 43(a) Violation

Claiborne also claims liability under Section 43(a) of the Lanham Act, which makes liable any person who uses in commerce in connection with goods or services "any false designation of origin ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the ... association of such person with another person, or as to the origin ... of his or her goods ... by another

person." 15 U.S.C. § 1125(a). The purpose of this section is to "prevent confusion regarding a product's source ... and to enable those that fashion a product to differentiate it from others on the market." *See Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1220 (2d Cir. 1987).

■ Included in this prohibition of unfair competition is "reverse passing off." *Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2d cir.1994). Reverse passing off includes, among other things, situations where the defendant removes the name or trademark of the plaintiff's product and sells that product under a name chosen by the defendant. *Id.*

To prevail on a reverse passing off claim, Claiborne must prove that (1) the sweaters originated with Claiborne; (2) the origin of the work was falsely designated by Mademoiselle; (3) the false designation of origin was likely to cause consumer confusion; and (4) Claiborne was harmed by Mademoiselle's false designation of origin. *Id.* at 781–85.

■ Claiborne has proved by a preponderance of the evidence that Mademoiselle violated Section 43(a) by reverse passing off. Newhouse conceded that Mademoiselle-brand look-alike garments were production Claiborne sweaters that could not be sold as first quality, and that those sweaters were designated and labeled as Mademoiselle-brand garments. Mademoiselle failed to rebut the evidence that they falsely designated the look-alike sweaters and sold them immediately adjacent to and intermixed with other Claiborne-brand garments.

If Newhouse is correct that the look-alike Mademoiselle-brand sweaters were found side by side among Claiborne-label sweaters because they were accidentally placed there by customers despite signs clearly identifying the Claiborne section, this establishes customer confusion. Indeed, the experts could not differentiate between the sweaters.

## II. *The Unclean Hands Defense Has Not Been Established*

■ It is a well-settled principle of trademark law that "the defense of unclean hands applies only with respect to the right in suit." *Warner Bros. Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir.1983). Where, as here, unclean hands is raised as a purported defense to a claim of trademark infringement, "what is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts." *Project Strategies Corp. v. National Communications Corp.*, 948 F.Supp. 218, 227 (E.D.N.Y. 1996). *See also Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814–15, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) ("[W]hile equity does not demand that its suitors shall have led blameless lives, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.").

Courts and commentators alike have rejected the thesis Mademoiselle advances here—that alleged bad faith in bringing suit can itself be the basis for an unclean hands defense to a trademark infringement action:

> While bringing a lawsuit brings the contested issue before the court, the act of bringing suit is not, itself, the matter concerning which a plaintiff seeks relief. Thus, the Court must focus on alleged inequitable conduct in the gaining or the use of the right being contested, not alleged inequitable conduct in the bringing of the lawsuit.

*Sears Roebuck & Co. v. Sears plc*, 744 F.Supp. 1297, 1310 (D.Del.1990). As a leading trademark treatise similarly explains, "[t]he act of bringing the lawsuit is not the subject matter concerning which plaintiff seeks relief. Unclean hands must relate to the getting or using the alleged trademark rights." 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:51 (4th ed.1998). *See also R&R Recreation Products, Inc. v. Joan Cook Inc.*, No. 91 Civ. 2589, 1992 WL 88171, at * 6 (S.D.N.Y. Apr.14, 1992) (dismissing unclean hands defense in trademark infringement action because, "[a]s alleged by defendant, plaintiffs' 'transgression' was bringing this suit"). Here, Mademoiselle did not even allege, much less prove, that Claiborne engaged in inequitable conduct in the gaining or the use of the trademark rights it seeks to enforce.

■ Even if the unclean hands defense advanced by Mademoiselle was legally viable, Mademoiselle failed to make even a *prima facie* showing that Claiborne lacked a proper basis for filing suit.

■ In addition, the alleged six year oral contract would be unenforceable by virtue of the statute of frauds, thereby undermining Mademoiselle's contention that Claiborne was acting with unclean hands by taking steps that Mademoiselle claims were intended to forestall performance that Claiborne was not obligated to provide. *See* N.Y.Gen. Oblig.Law § 5–701(a)(1) (McKinney 1989) (a contract that "[b]y its terms is not to be performed within one year from the making thereof" is void in the absence of a writing subscribed by the party against whom enforcement is sought); N.Y.U.C .C. § 2–201(1) (McKinney 1993) ("A contract for the sale of goods for the price of $500 or more is not enforceable ... unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought."). Finally, Mademoiselle offered no competent or credible evidence that such a contract existed, let alone that it was the impetus for filing this lawsuit.

### III. *Laches is Unavailable as a Defense*

■ A defendant asserting laches as a defense to trademark violations must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights. *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1040 (2d Cir.1980) (citing *Cuban Cigar Brands, N.V. v. Upmann Int'l. Inc.,* 457 F.Supp. 1090, 1096 (S.D.N.Y.1978), *aff'd,* 607 F.2d 995 (1979)). There is no evidence here that Claiborne inexcusably delayed or that Mademoiselle will be prejudiced if it is enjoined from infringing or counterfeiting Claiborne merchandise. To the contrary, the evidence showed that Claiborne's investigators acted promptly on the tip Claiborne received and that, after full investigation revealed the scope of Mademoiselle's infringing activities,

Claiborne took prompt steps, by filing this action, to halt these activities.

Even if some of Claiborne's employees were aware of Mademoiselle's sales to retail customers through Mademoiselle's outlet store as early as 1993, Claiborne was not aware of the magnitude of Mademoiselle's infringement and such limited knowledge does not warrant denial of Claiborne's relief. The mere awareness by some Claiborne employees that these stores existed does not give rise to sufficient knowledge to establish laches or acquiescence by Claiborne. *Bear U.S.A., Inc. v. A.J. Leather Outerwear, Inc.,* 909 F.Supp. 896, 909–10 (S.D.N.Y.1995) (delay due to failure to realize severity of infringement does not defeat presumption of irreparable injury); *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 39–40 (2d Cir.1995). The uncontroverted testimony shows that Claiborne promptly investigated Mademoiselle and filed this action immediately upon learning the full scope of Mademoiselle's unauthorized activities.

### IV. *Damages*

Upon the finding of infringement under Sections 32 and 43(a) of the Lanham Act, set forth above, Claiborne is entitled to recover: (1) Mademoiselle's profits, (2) any damages sustained by Claiborne, and (3) the costs of the action. Upon a finding Mademoiselle intentionally used a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in 34(d) of the Lanham Act, 15 U.S.C. § 1116(d)), in connection with the sale, offering for sale, or distribution of goods, unless the Court finds "extenuating circumstances," it must enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee. 15 U.S.C. § 1117(b).

■ To calculate damages is a daunting task, given the absence of Mademoiselle's records. While Claiborne can determine the number of units and styles that it has received, there is no certain method to determine the number of units which Mademoiselle produced during the relevant period. Imburgia, as Claiborne's expert, used the two methods described above to make his reconstruction of the Mademoiselle produc-

tion. He used the Mademoiselle cutting extracts as the measure of production considering them more reliable than the packing extracts because, among other things, of the tendency of missing labels to distort the latter reports. The production number was then reduced by the units received by Claiborne.

Two difficulties were presented by this method. First, the loss in the manufacturing process from cutting through packing and attrition (or as Mademoiselle's production expert termed it, "MIAs"). Imburgia considered a one percent calculation for that loss, an industry standard supported by the record. The other difficulty presented was the absence of cutting extracts for approximately 59% of the styles ordered by Claiborne.

The second method Imburgia employed was based on the October 31, 1995 inventory report. Both sides acknowledge some unreliability in this inventory: first, of course, because it is a snapshot of time, which Imburgia assumed covered a ten months period, based on the pattern of Claiborne orders and Mademoiselle production. Imburgia also recognized discrepancies between the extract reports and the inventory and again he assumed the inventory was corrected by a physical inventory, though no records of such a physical count were available.

The cutting extract calculation is the most accurate damage calculation emerging from this record. It covers the longest period of time and contains fewer assumptions. Under that method 42,322 more units were produced by Mademoiselle than received by Claiborne for the 41% of the Claiborne styles covered.

In addition, the cutting extract methodology permits consideration of the effect of 200 piece requirement which as found above applied to Mademoiselle and thereby reduced the number of units to 28,866. No attack was launched by Mademoiselle on this aspect of Imburgia's calculation.

Imburgia's calculation of lost profits based on the number of garments produced and not received less the 200 piece requirement was straightforward, credible and not seriously challenged. It resulted in lost profits of $291,434.

■ Failure to produce the most satisfactory evidence of sales—or absence of sales—leaves Mademoiselle's case exposed to less definite and certain methods of proof. *See Deering, Milliken & Co. v. Gilbert,* 269 F.2d 191, 193 (2d Cir.1959). "[W]here, as here, the defendant controls the most satisfactory evidence of sales the plaintiff needs only establish a basis for a reasoned conclusion as to the extent of injury caused by the deliberate and wrongful infringement." *Id.*

Based upon the facts found above, it is appropriate to double the lost profit calculation of $291,434 based upon the absence of Mademoiselle's records for 59% of the styles ordered by Claiborne. Therefore, the total damages awarded shall be $582,868.

Again, given the absence of records, Imburgia could not and did not attempt to determine damages from Mademoiselle passing off Claiborne products as its own. Accordingly, no damages are awarded for this violation.

■ Claiborne also seeks under § 1117(b) treble damages and reasonable attorney's fee. That section, however, provides that such damages and fees shall be awarded, "unless the court finds extenuating circumstances." The totality of the circumstances establish extenuating circumstances. Paramount among the extenuating circumstances is degree of certainty of the damage calculation, which gives rise to some doubt that trebling the calculation is in the interests of justice. Moreover, the complicated business relationship between the parties, and the poor documentation of that relationship on both sides, distinguishes this case from more egregious cases of intentional trademark infringement. Therefore the request for treble damages and attorney's fees is denied.

Pursuant § 1117(b) the Court "may in its discretion award prejudgment interest," and it is awarded here. Mademoiselle shall pay costs pursuant to 15 U.S.C. § 1117(a).

Finally, pursuant to § 1116(a), Mademoiselle is permanently enjoined from manufacturing, exporting, importing, distributing,

offering for sale or selling unauthorized Claiborne merchandise, and all unauthorized merchandise in Mademoiselle's possession or control shall be delivered up to Claiborne for destruction or other disposition at Claiborne's sole discretion.

It is so ordered.