**Richard FAGAN, Plaintiff–Appellant,**

v.

**NEW YORK STATE ELECTRIC & GAS CORP., Defendant–Appellee.**

**Docket No. 98–7266**

United States Court of Appeals, Second Circuit.

Argued: Dec. 3, 1998.

Decided: Aug. 2, 1999.

tion in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.* Judge Scullin ruled that appellant had failed to establish a *prima facie* case of age discrimination, and that, in the alternative, no genuine issue of material fact existed as to whether appellant was terminated as a result of intentional age discrimination.

## I. BACKGROUND

### A. *Appellant's promotion to head MSBU*

Appellee employed appellant from 1971 until the time it fired him in 1996 at the age of 55.

In 1990, appellee reorganized into three business units—Electric, Gas, and Management Services—and created the position of senior vice president to head each unit. Appellee's chairman and chief executive officer James Carrigg recommended to the board of directors that appellant become senior vice president of the Management Services Business Unit ("MSBU"), and the board promoted appellant to that position in 1990.

MSBU administered a variety of company functions including finances, auditing, human resources, security, information systems, and a portion of customer services. Appellant reported directly to Carrigg, and it was appellant's responsibility to inform Carrigg and the board of directors about "significant" developments within MSBU.

### B. *The FRS project*

In 1992, MSBU, with the assistance of the accounting firm Coopers & Lybrand ("Coopers"), studied the possibility of upgrading appellee's internal accounting methods. On completion of the study, MSBU recommended the implementation of the Financial Reporting System ("FRS"), which envisioned the installation of a new computer system to revamp the company's accounting system. In January 1993, with Carrigg's endorsement, the board approved a $15 million expenditure

Anna K. Holmberg, Ithaca, N.Y. (Dirk A. Galbraith, Holmberg, Galbraith, Holmberg & Orkin, Ithaca, NY, of counsel) for Plaintiff–Appellant.

James S. Gleason, Binghamton, N.Y. (Leslie Prechtl Guy, Hinman, Howard & Kattell, Binghamton, NY, of counsel) for Defendant–Appellee.

Before: NEWMAN, LEVAL, and PARKER, Circuit Judges.

PARKER, Circuit Judge:

Plaintiff-appellant Richard Fagan appeals from the judgment of the United States District Court for the Northern District of New York (Frederick J. Scullin, Jr., *Judge*) entered January 27, 1998, granting the motion by defendant-appellee New York State Electric & Gas Corp. for summary judgment.

After appellee fired him at the age of 55, appellant sued under the Age Discrimina-

to implement FRS. FRS was to be operational by January 1, 1995. Because appellee's fiscal year ran from January to December, any delay beyond January 1, 1995, would delay implementation until January 1, 1996. Soon after board-approval, Coopers was hired to consult on the project. Coopers began work in February of 1993 without a written contract.

FRS was an MSBU project and was included in the MSBU business plan prepared by appellant. Appellant considered FRS to be one of four "blue chip" projects within MSBU in 1993. Vice–President Everett Robinson, the "executive sponsor" of FRS, reported to appellant. A nine-member steering committee was formed to oversee FRS. Appellant was on the committee, as was Carrigg's executive assistant Ralph Tedesco. Tedesco had no supervisory authority over appellant.

Appellant went on medical leave in July 1993 and returned in October 1993. At steering committee meetings on October 19, 1993, and November 2, 1993, Coopers reported that installation of the "client/server aspect of the system" would probably be delayed, and that the cost of the project would increase to between $17.5 and $20 million. The delay to the server was not, at that time, expected to delay implementation of the whole system. Tedesco reported this information to Carrigg.

In early December 1993, appellant learned that Coopers was seeking an additional $1.5 million in fees. Additionally, appellant learned of a new problem regarding the integration of the old and new computer systems. Appellant spoke to Robinson and Frank Puzio, the Coopers partner in charge of appellee's audit, about the problem. They assured him that the problem would be solved.

On January 24, 1994, Carrigg called a meeting to finalize the signing of the contract with Coopers. Carrigg, appellant, Robinson, and Tedesco were present. By this time, appellant "had concerns" about cost overruns and was also "concerned" that the implementation date for FRS

would have to be moved back because of problems with the server and the integration of the two systems. However, appellant did not tell Carrigg about these concerns. At the meeting, Robinson told Carrigg that FRS was on time and on budget, and appellant confirmed that this was true. Carrigg then executed the Coopers contract.

By March 8, 1994, appellant had a "very strong concern" about the problem of integrating the old and new computer systems, and believed that the failure to solve the integration problem "threaten[ed] the continuity" of FRS. Appellant called Puzio to discuss his concerns, but again did not inform Carrigg.

On March 11, 1994, Robinson and appellant attended a meeting of the board's audit committee. Robinson represented to the committee that FRS was on time and on budget. Although appellant believed there were "strong indications" that there would be delay and cost overruns, he did not say anything. Appellant believed that Robinson's representations were accurate "given the context." On the same day, the full board met. With appellant present, Robinson represented that there were cost overruns and that he would report back to the board in more detail. Appellant again remained silent.

On March 24, 1994, Robinson approached appellant and suggested suspending FRS. Robinson believed that technical solutions were unavailable given the cost and the deadline. The estimated cost for the project was now $26 million. On April 5, 1994, appellant had a pre-arranged meeting with Carrigg on topics unrelated to FRS. Appellant did not tell Carrigg that Robinson had suggested suspending FRS.

On April 6, 1994, Robinson went before a committee of appellee's vice presidents and proposed to suspend FRS. The committee voted in favor of suspending FRS. On April 11, 1994, at the office of the chairman meeting, Robinson made a pre-

sentation about FRS, and the program was formally suspended.

### C. *The investigation of Robinson*

In July 1994, Carrigg commissioned an internal investigation to determine whether Robinson "had been forthright" concerning FRS. On October 17, 1994, before the investigation was complete, Carrigg told appellant that he intended to terminate Robinson. He did not, however, tell appellant that he believed that appellant had "committed any misconduct or that [Carrigg] intended to take any job action in respect to [appellant]." Nevertheless, appellant took notes about this meeting and wrote, "My assessment of [Carrigg's] issue with me is now his confidence level with me in view of his perception of lack of full disclosure of the FRS project status at the meeting of January 24, 1994."

The report on the Robinson investigation was completed November 3, 1994. Carrigg viewed the report as clear evidence that Robinson had repeatedly misrepresented the status of FRS. Carrigg also believed that the report indicated that appellant was aware as early as January 24, 1994, that the project was late and over budget. At this time, appellant became concerned "that Mr. Carrigg had taken action against Mr. Robinson he might take similar action against myself." On November 7, 1994, appellant met with Carrigg to discuss these concerns. Carrigg did not "indicate to [appellant] at that time that he had any complaint with [appellant's] performance." In December 1994, Robinson resigned.

### D. *Appellant's demotion and subsequent termination*

On December 9, 1994, Carrigg proposed and the board approved a reorganization of appellee's senior management. On that same day, Carrigg informed appellant that Carrigg had lost confidence in him because he had not kept Carrigg advised regarding FRS. Carrigg said that he would not terminate appellant immediately. Instead, he would allow him to remain at his current pay, with reduced responsibilities, until he was eligible for appellee's early retirement plan on January 3, 1996. Carrigg told appellant that this decision was final. Because he was permitted to remain employed until he became eligible for early retirement, appellant received approximately $1 million more when he was terminated than he would have received if he had been terminated in December 1994.

Pending termination, appellant's duties were reassigned. The parties agree that appellant maintained a portion of his prior work, but dispute the manner of the reassignment of the bulk of his work. Appellee asserts that all of the reassigned duties were given either to Jack Roskoz—who was promoted to the new position of executive vice president from his old position as head of the Electric Business Unit—or to Carrigg himself. Both Roskoz and Carrigg are older than appellant.

Appellant does not dispute that some of his duties were reassigned to Roskoz and Carrigg. However, he asserts that his duties with regard to the information services department, the budget and forecast department, and the customer service department were transferred to three managers—Smith, Rude, and Putman—whose ages ranged from 41 to 46 years old. (Appellant was almost 54 at the time of the December 9, 1994, restructuring.) Appellant alleges that these three managers "comprised a new tier of management and were effectively given my job responsibilities." Appellant contends that Smith, Rude, and Putman reported "to either" Roskoz or "directly" to Carrigg. Appellee responds that Smith, Rude, and Putman held the position of vice president (as contrasted with appellant who held the position of senior vice president), and that all three reported to Roskoz (as contrasted to appellant who had reported to Carrigg).

Appellant was terminated on January 31, 1996, at the age of 55. He asserts that sixty per cent of his "remaining superviso-

ry responsibilities" were transferred to chief financial officer Sherwood Rafferty, who was then 48 years old.

Tedesco, who was 41 years old at the time of the reorganization, was not disciplined for his role in FRS. As part of the reorganization, he was promoted to vice president.

### E. *The early retirement program*

In February 1994—roughly three months before FRS was suspended—appellee instituted a voluntary early retirement program for employees 55 years old or older. Appellant asserts that Carrigg "on at least one occasion expressed his pleasure with reducing the number of officers at [appellee] who were 55 years of age or older."

### II. DISCUSSION

The parties dispute whether, for the purposes of defeating summary judgment, plaintiff has established a *prima facie* case. We decline to reach that issue because, *prima facie* case aside, appellant has not raised a triable issue of fact as to whether appellee terminated him because of his age. *Cf. Scaria v. Rubin,* 117 F.3d 652, 654 (2d Cir.1997) (where minimal requirements of *prima facie* case are not in dispute, question on summary judgment becomes whether plaintiff has raised a triable issue of fact on ultimate question of age discrimination).

### A. *Standard of review*

 We review a district court's grant of summary judgment *de novo,* taking all factual inferences in favor of the non-moving party. Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law. *Harvis*

*Trien & Beck, P.C. v. Federal Home Loan Mortgage Corp. (In re Blackwood Assoc., L.P.),* 153 F.3d 61, 67 (2d Cir.1998).

### B. *Controlling legal principles*

 The ADEA bans discrimination against employees because of their age. *O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); 29 U.S.C. § 623(a). To prevail on an ADEA claim, the plaintiff must first establish a *prima facie* case by showing membership in a protected class, qualification for the position, an adverse employment action, and circumstances that give at least minimal support to an inference of discrimination. *See Stratton v. Department for the Aging for the City of N.Y.,* 132 F.3d 869, 879 (2d Cir.1997); *Fisher v. Vassar College,* 114 F.3d 1332, 1336–37 (2d Cir.1997) (in banc) ("[A] plaintiff alleging discrimination can satisfy the prima facie case ... *without* submitting evidence sufficient to support a finding in his favor on each element that the plaintiff must ultimately prove to win."), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998).

██ Establishment of a *prima facie* case obliges the employer to offer a legitimate, nondiscriminatory reason for its employment decision. If the employer articulates this nondiscriminatory reason, the plaintiff must then show that the proffered reason was a pretext for age discrimination. *Scaria,* 117 F.3d at 654. The ultimate issue is whether the plaintiff has proved that the adverse employment action was motivated at least in part by age discrimination. *Stratton,* 132 F.3d at 878; *see Renz v. Grey Advertising, Inc.,* 135 F.3d 217, 222 (2d Cir.1997) (plaintiff is entitled to prevail if she demonstrates that her age played a motivating role in, or contributed to, the employer's decision).[1] *See generally Fisher,* 114 F.3d at 1335–40.

---

1. This re-statement of ADEA principles applies to so-called "pretext" cases. Given the arguments of the parties, the burden-shifting analysis that occurs under the so-called "mixed-motives" cases is irrelevant to this case. *See Stratton,* 132 F.3d at 878 (comparing the two types of cases).

### C. *Issues on summary judgment*

Appellant raises four main arguments in support of his contention that a genuine issue of material fact remains for trial: that appellant's termination was explicitly tied to his age; that appellant was replaced by younger employees; that Tedesco—a similarly situated younger employee—was promoted, whereas appellant was fired; and, that Carrigg's expressions of dissatisfaction with appellant's work were pretextual.

#### 1. *Termination tied to age*

■ Appellant contends that the fact that his termination was linked to the early retirement program shows that age was a factor in his termination. Appellant asserts that his termination was "tied explicitly to his age," and was "an extension of defendant's policy to reduce the number of older employees on its staff."

■ The existence of the early retirement plan is not evidence of age discrimination. The ADEA creates a safe harbor for voluntary early retirement plans that are "consistent with the relevant purpose or purposes" of the ADEA, and the implementation of such a plan by an employer cannot serve as evidence of unlawful age discrimination. *Raskin v. Wyatt Co.*, 125 F.3d 55, 61–62 (2d Cir.1997) (quoting 29 U.S.C. § 623(f)(2)(B)(ii)). Such plans are accurately perceived not as a sign of discrimination, but as a benefit to the recipient. *See id.*

■ Appellant does not argue that appellee's voluntary early retirement plan was unlawful or that it was inconsistent with the purposes of the ADEA. Instead, he focuses on the fact that Carrigg, in commenting on the retirement plan, "expressed ... pleasure with reducing the number of officers at [appellee] who were 55 years of age or older." Contrary to appellant's argument, Carrigg's expression of "pleasure" that the undisputedly lawful

plan was having a lawful effect is irrelevant. *Cf. Auerbach v. Board of Educ.*, 136 F.3d 104, 113 (2d Cir.1998) (noting that it was Congress's intent to permit employers to offer older employees "a special incentive to retire"); *Cipriano v. Board of Educ.*, 785 F.2d 51, 56 (2d Cir.1986) ("There is nothing inconsistent with the ADEA in offering older employees compensation for leaving the workforce....").
Notably, nothing in Carrigg's statement, as paraphrased by appellant, suggests animus against older employees.

Nor does the fact that appellant's termination was tied to the plan tend to show that appellant was terminated because of his age. Because he was close to the 55–year-old eligibility limit, appellant was permitted to remain in his position until he became eligible for the plan. Thus, appellee's decision to "tie[ ] explicitly" appellant's termination to his age resulted in appellant receiving approximately $1 million he would not otherwise have received. No rational juror could conclude that this windfall is evidence of age discrimination.

#### 2. *Replacement by younger workers*

■ Appellant asserts that at the time of the 1994 reorganization appellee created a "new tier of management" by "effectively giv[ing] my job responsibilities" to Smith, Rude, and Putman. Essentially, appellant argues that he was replaced by this "tier" of three younger workers.

Appellee's 1995 reorganization plan shows that Smith, Rude, and Putman held positions less senior than appellant and reported not to Carrigg (as appellant had done when he headed MSBU) but to Roskoz. The plan shows that Roskoz was the vice president ultimately responsible for their work, just as appellant, according to his own contentions[2], had been the vice president previously responsible for the work.

**2.** Appellee asserts that the work reassigned to Rude had previously been performed within

the Electric Business Unit, which was not supervised by appellant.

Thus, the reorganization plan provides specific evidence that appellant's "responsibilities" were not transferred to younger employees, but rather that they were transferred to Roskoz. In this context, appellant's unparticularized characterization that his job responsibilities were "effectively" reassigned to the three younger employees cannot, without more, create an issue of fact for the jury. *See* Fed. R.Civ.P. 56(e) (to oppose motion for summary judgment supported as provided in Rule 56, adverse party must set forth "specific facts" showing that there is a genuine issue for trial); *BellSouth Telecomm., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (party opposing motion for summary judgment must set forth concrete particulars).

Appellant's assertion that "60% of my remaining supervisory responsibilities were transferred" to the 48 year old Rafferty when appellant was ultimately terminated in 1996 underscores the conclusion that appellant's allegations are too vague to create a genuine issue as to how his work was reassigned. Appellant fails to produce evidence to explain how, if appellant's "job responsibilities" were "effectively" reassigned in 1994, there would have been "remaining supervisory responsibilities" to delegate to Rafferty in 1996. In keeping with his ambiguous contentions, appellant does not allege how the remaining forty per cent of his "remaining supervisory responsibilities" were reassigned upon his termination.[3]

■ This analysis should not be read as suggesting that appellant could have defeated summary judgment merely by showing that he was replaced by these younger employees. The replacement of an older worker with a younger worker or workers does not itself prove unlawful discrimination. *See Hollander v. American Cyanamid Co.*, 172 F.3d 192, 199 n. 3, 204 (2d Cir.1999) (affirming grant of summary judgment for defendant although plaintiff

had established dispute of fact as to whether he had been replaced by younger workers); *accord Futrell v. J.I. Case*, 38 F.3d 342, 348 (7th Cir.1994) ("Typically, younger workers will replace older ones; this is an unremarkable phenomenon that does not, in and of itself, prove discrimination.").

### 3. *Treatment of Tedesco*

Appellant argues that the lenient treatment given to the younger Tedesco is evidence of age discrimination against appellant. The record fails to support this argument.

■ Appellant, not Tedesco, ran MSBU. Further, there is no evidence that Tedesco was privy to the post-November 1993 information that the problems with FRS were worsening and, eventually, becoming fatal. Appellant possessed this information and withheld it from Carrigg. In sum, the record does not support the inference that Tedesco's promotion marks the favorable treatment of younger but otherwise similarly situated employees. *See Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir.1997) (for disparate treatment of similarly situated employees to be probative of discrimination, employees must be similarly situated in all material respects).

### 4. *Pretext*

■ Appellant contends that Carrigg's failure to censure appellant quickly and decisively for his perceived failures on FRS permits the inference that Carrigg was not displeased with appellant's work. This argument does find minimal support in the record. In particular, appellant met with Carrigg on October 17, 1994, and November 7, 1994. At the October meeting, Carrigg told appellant that he intended to terminate Robinson. At the November meeting, appellant discussed his concern that Carrigg would discipline

---

**3.** Adding to the ambiguity is appellant's admission that Roskoz and Carrigg directly assumed supervision over some of the MSBU departments.

him because of the situation with FRS. At neither meeting did Carrigg express dissatisfaction with appellant's performance. At most, this evidence shows that Carrigg was less than fully forthcoming with appellant before December 1994. We find it difficult to imagine that a rational fact-finder would infer from this reticence that the reason articulated for appellant's termination was pretextual. Notably, appellant himself believed in light of the October 1994 meeting that Carrigg lacked confidence in him due to appellant's failure to disclose problems with FRS.

Regardless, even if we view the evidence as creating an issue of fact on pretext, appellant must point to evidence from which a fact-finder could infer that the pretext was "masking unlawful discrimination." *Scaria,* 117 F.3d at 655. While, in some cases, a finding of pretext may tend to show discrimination, a finding in this case would not. *See Fisher,* 114 F.3d at 1338 ("[T]he fact that the proffered reason was false does not necessarily mean that the true motive was the illegal one argued by the plaintiff. . . . The sufficiency of the finding of pretext to support a finding of discrimination depends on the circumstances of the case.").

### III. CONCLUSION

Taking all factual inferences in favor of appellant, we conclude that no rational trier of fact could find that appellee terminated appellant because of his age. Accordingly, the judgment of the district court is AFFIRMED.