The PROCTER & GAMBLE
COMPANY, Plaintiff,

v.

QUALITY KING DISTRIBUTORS, INC., Neal Rose, Omni Source International, Inc., Allou Health & Beauty Care, Inc., Salvatore "Sal" Arzillo, Jr., Beverly Zoeller, Erica Weber, Zoeller International Trading, Inc., Frank Pandullo, Derek Ma, Chris A. Schneyderberg, Rainbow Soap Company, Abe Gruda, Paul Doubilet, A. Gruda Products Co., Ayesha Alam, Philip Kalifon, Ianco Envirotech Inc. and John Does 1–10, Defendants.

Quality King Distributors, Inc. and Omni Source International, Inc., Counterclaim Plaintiffs,

v.

The Proctor & Gamble Company, Proctor & Gamble, Inc., Counterclaim Defendants.

No. CV95–3113 (ADS).

United States District Court, E.D. New York.

Dec. 4, 2000.

mara, of counsel, for defendant Neal Rose and defendant-counterclaim plaintiff Omnisource International, Inc.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This action arises from the claims of the plaintiff-counterclaim defendant, Proctor & Gamble Company ("P & G"), against numerous parties, including Quality King Distributors, Inc. ("Quality King") and Omnisource International, Inc. ("Omni"), and Neal Rose ("Rose"), whom it alleges were mixing, bottling, selling and distributing potentially harmful, counterfeit Head & Shoulders shampoo, in violation of the Lanham Trade–Mark Act, 15 U.S.C. § 1501, et seq. Presently before the Court is a motion by plaintiff-counterclaim defendant, P & G, for summary judgment against Quality King, Rose, and Omni, as to liability for trademark infringement under 15 U.S.C. § 1114(1)(A). Also before this Court are two cross-motions for summary judgment against P & G, one by defendant-counterclaim plaintiffs, Quality King, and one by defendant-counterclaim plaintiffs Neal Rose and Omni to dismiss the complaint.

Kramer, Levin, Naftalis & Frankel, New York City, by Harold P. Weinberger, of counsel, for plaintiff-counterclaim defendant The Procter & Gamble Company and counterclaim defendant Procter & Gamble, Inc.

Edwards & Angell, New York City, by Ira G. Greenberg, Anthony J. Viola, of counsel, for defendant-counterclaim plaintiff Quality King Distributors, Inc.

Hopkins & Sutter, Chicago, IL, by David B. Goroff, of counsel, for defendant Neal Rose and defendant-counterclaim plaintiff Omnisource International, Inc.

Certilman Balin Adler & Hyman, LLP, East Meadow, NY, by Thomas J. McNa-

## I. BACKGROUND

The following facts are undisputed unless otherwise indicated. P & G is a worldwide distributor of consumer products and household goods. In 1961, the company introduced "Head & Shoulders" shampoo, and since 1963, Head & Shoulders has been the leading brand of dandruff shampoo sold in the United States. P & G owns a federal trademark registration for the name "Head & Shoulders," Registration Number 729556, registered in the Principal Register on March 4, 1962, and renewed on April 3, 1982. P & G has applied for registration of two additional trademarks covering the trade dress of the Head & Shoulders packaging.

P & G has spent, and continues to spend, large sums of money marketing and selling in interstate commerce Head & Shoulders shampoo bearing its trademark and trade dress. As a result of the extensive advertising of Head & Shoulders in connection with the P & G trademark; the widespread sale of Head & Shoulders; and the celebrity that the Head & Shoulders trademark and trade dress have achieved, bottle of shampoo bearing the Head & Shoulders trademark and trade dress have been and are now recognized by the public and in the trade as originating from a single source, namely, P & G.

P & G owns or controls P & G Canada, a subsidiary corporation organized and existing under the laws of Ontario, Canada. P & G Canada owns and operates a manufacturing facility located in Hamilton, Ontario, Canada (the "Hamilton facility"). P & G Canada manufactured Head & Shoulders shampoo at the Hamilton facility for distribution in Canada and the United States.

In or about early 1992, P & G Canada and Ianco Envirotech, Inc. ("Ianco"), a recycling company operated by Philip Kalifon ("Kalifon"), entered into an agreement whereby P & G Canada would give Ianco waste materials from the Hamilton facility. Ianco could then dispose of the materials in any manner it saw fit, provided that:

2) In [Ianco's] subsequent handling of these products including any other parties or individuals, [Ianco shall] make no reference to Proctor & Gamble or any of our product brand names, trademarks, logos or designs. This provision shall survive this agreement.

3) If condition 2) is violated, Ianco will be charged at the normal wholesale rate of this product.

\*    \*    \*    \*    \*    \*

5) Product identity will be modified prior to sale by Ianco Envirotech Inc. so that its source cannot be easily recognized.

6) Ianco undertakes to ensure that product end and use must specifically not include human use for personal care or for animal use. As a general household cleaner/soap or other non personal use would be acceptable.

(Letter Agreement, signed by Ianco and P & G Canada). Kalifon understood that Ianco could resell P & G's waste, but before doing so, it must disguise the fact that the material originated from P & G. Ianco hid P & G's identity by adding water, color, or smell to the material it received from P & G Canada. By arranging for Ianco to dispose of its waste material, P & G Canada saved an approximate sum of $300,000 it would have had to pay to dispose of the waste in a landfill.

In late 1994 or early 1995, defendant Paul Doubilet ("Doubilet"), of defendant A Gruda Products Co. ("Gruda"), approached defendant Ayesha Alam ("Alam"), a chemist and former Ianco employee, and asked her to fill roughly 30,000 bottles with blue shampoo. Alam obtained eight drums of P & G waste, containing a form of Head & Shoulders, from Ianco and mixed the contents with four drums of water and salt. She was able to fill 10,000 of the bottles with this mixture. Alam filled the remaining 20,000 bottles with shampoo blends that she had received from a variety of companies and to which she added blue coloring. Doubilet sold the 30,000 bottles of blue shampoo to defendant Frank Pandullo ("Pandullo").

Pandullo sold the 30,000 bottles of shampoo to defendant Beverly Zoeller ("Zoeller") of defendant Zoeller International Trading, Inc. At the time of the sale, the bottles were labeled as Head & Shoulders. Zoeller resold the shampoo to defendant Salvatore ("Sal") Arzillo ("Arzillo"), the owner and operator of Rapid Air & Ocean, Inc. ("Rapid Air") and Southern Trading International, Inc. ("Southern Trading"). Arzillo sold the shampoo to Omni, and Omni sold it to David Rothenberg ("Rothenberg") at defendant Quality King. In turn, Quality King sold approximately

4,400 bottles of shampoo bearing the Head & Shoulders label to Peyton's, which is an operating division of the grocery store, The Kroger Company.

In 1995, P & G received several consumer complaints regarding bottles of alleged Head & Shoulders that had been purchased from Kroger stores. P & G contacted Kroger and obtained several bottles of the shampoo. Bruce Caldwell ("Caldwell"), a chemical engineer and longtime employee of P & G, knew the bottles were counterfeit as soon as he saw them. First, the labels were paper copies of a discontinued plastic label. The writing on the labels was in a typeface not used by P & G and the labels did not contain the numeric code that is printed on every Head & Shoulders label. Second, the bottles themselves were replicas of a bottle shape that was last produced in the United States in 1986. In addition, the bottles did not have the smooth finish of genuine bottles; did not contain the supplier identification codes that are embedded in genuine bottles; and did not have the leak-proof flip-top closure that is on top of every genuine bottle of Head & Shoulders.

The Hair Care Product Development section of P & G tested the contents of the counterfeit bottles, and their results revealed that the liquid contained in those bottles was not genuine Head & Shoulders. Specifically, none of the tested liquid contained more than 50% of the level of ZPT, the only active ingredient in Head & Shoulders, contained in genuine Head & Shoulders.

On August 7, 1995, the United States Marshals seized approximately 25,000 bottles of counterfeit Head & Shoulders from Quality King's warehouses in Ronkonkoma, New York, pursuant to an *ex parte* order of this Court.

P & G commenced this action on August 3, 1995, and on September 3, 1997, P & G filed its second amended complaint which alleges seven causes of action. Counts one and two claim that the defendants trafficked in counterfeit goods in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a) and (b). Counts three and four assert that the defendants falsely designated the origin of their products in violation of the Lanham Act, 15 U.S.C. §§ 1125(a)(1)(A) and (B). The fifth cause of action alleges injury to business reputation and dilution of mark in violation of New York General Business Law § 368–d, and the sixth cause of action alleges unfair competition in violation of New York common law. The seventh count, brought only against the defendants Quality King and Allou, claims that those defendants are in contempt of court in connection with the violation of a prior court order.

The defendants Beverly Zoeller, Erica Weber, Zoeller International Trading, Inc., Derek Ma, Chris A. Schneyderberg, Rainbow Soap Company, Abe Gruda, Paul Doubilet, A. Gruda Products Co., Ayesha Alam, Philip Kalifon, and Ianco Envirotech, Inc. were served in this action and have failed either to appear or answer.

Presently before the court are: (1) the motion by P & G for summary judgment as to all the defendants' liability for trademark infringement under 15 U.S.C. § 1114(1)(a); and (2) the cross-motions by Quality King, Omni, and Rose for summary judgment dismissing P & G's claims on theories of unclean hands and abandonment of trademark rights.

## II. *DISCUSSION*

### A. Summary Judgment Standard

A court may grant summary judgment "only if the pleadings and evidentiary submissions demonstrate the absence of any genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Tasini v. New York Times Co.,* 192 F.3d 356, 360 (2d Cir.1999); *see also* Fed.R.Civ.P. 56(c); *Hunt v. Cromartie,* 526 U.S. 541, 119 S.Ct. 1545, 1550, 143 L.Ed.2d 731 (1999) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 [1986] ); *Turner v.*

*General Motors Acceptance Corp.,* 180 F.3d 451, 453 (2d Cir.1999);. In this determination, the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Tasini,* 192 F.3d at 360; *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998); *Twin Lab., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990).

According to the Second Circuit, "[s]ummary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict." *United National Ins. Co. v. The Tunnel, Inc.,* 988 F.2d 351, 355 (2d Cir.1993). Once a party moves for summary judgment in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists. *See Fagan v. New York State Elec. & Gas Corp.,* 186 F.3d 127, 132 (2d Cir. 1999); *West–Fair Elec. Contractors v. Aetna Cas. & Surety Co.,* 78 F.3d 61, 63 (2d Cir.1996). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. *See Kulak v. City of New York,* 88 F.3d 63, 70 (2d Cir.1996).

However, a genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Moreover, if there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Grain Traders, Inc. v. Citibank, N.A.,* 160 F.3d 97, 100 (2d Cir. 1998); *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996). Finally, the Court is charged with the function of "issue finding," not "issue resolution." *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir.1994).

**B. Lanham Act Standards**

The Lanham Trade–Mark Act of 1946, codified as amended 15 U.S.C. § 1051–1072, 1091–1096, 1111–1121, 1123–1127 (1988), protects both the consumer and the registrant. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 636 (1st Cir.1992). The Act guards the public "against deceit as to the sources of its purchases," *Zippo Mfg. Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670, 137 U.S.P.Q. 413 (S.D.N.Y.1963), guarantees that a consumer who purchases a specific product receives the special characteristics associated with that product, *see Nestle, S.A.,* 982 F.2d at 636, and protects the registrant's "right to enjoy business earned through investment in the good will and reputation attached to a trade name." *Zippo Mfg. Co.,* 216 F.Supp. at 670. In sum, the Act guarantees consistency and thus "wards off both consumer confusion and possible deceit." *Nestle, S.A.,* 982 F.2d at 636.

Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides, in relevant part:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake or to deceive . . .

shall be liable in a civil action by the registrant.

Notably, the registrant need not prove intent in order to succeed on the issue of liability. *See El Greco Leather Products Co. v. Shoe World, Inc.,* 806 F.2d 392, 396 (2d Cir.1986) (holding that defendant's "claimed lack of knowledge of its supplier's infringement, even if true, provides no defense"); *DeAcosta v. Brown,* 146 F.2d 408, 410–12 (2d Cir.1944); *Microsoft Corp. v. Grey Computer,* 910 F.Supp. 1077, 1086 (D.Md.1995); 2 M. McCarthy, Trademarks and Unfair Competition § 23:107, at 23–

248 to 23–249 (2000). However, intent may enter the equation when the registrant seeks damages. *See* 15 U.S.C. § 1117(b); *Grey Computer,* 910 F.Supp. at 1086 (holding that defendant's intent goes to issue of damages, not liability); *see generally George Basch Co., Inc. v. Blue Coral, Inc.,* 968 F.2d 1532, 1540 (2d Cir.1992) (concluding that plaintiff may recover own lost profits upon showing of actual consumer confusion, but to recover infringer's lost profits, plaintiff must prove defendant's willful deception). Given that P & G moves for summary judgment only on the issue of liability, the knowledge or intent of the defendants is not an issue presently before this Court.

■ To succeed in establishing liability under Section 32(1) of the Lanham Act, the plaintiff must prove: (1) that it owns a valid, protectable trademark; (2) that the defendants used the registrant's trademark in commerce and without consent; and (3) that there was a likelihood of consumer confusion. *See Grey,* 910 F.Supp. at 1086–88. However, "likelihood of confusion" is the basic test of federal statutory trademark infringement. *See International Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr.,* 103 F.3d 196, 200 (1st Cir.1996); *El Greco,* 806 F.2d at 395 (emphasizing importance of "likelihood of confusion" factor).

It is undisputed that P & G is the owner of a federal trademark for the name "Head & Shoulders," Registered Trademark No. 729556, registered in the United States Patent and Trademark Office on the Principal Register on March 4, 1962, and renewed on April 3, 1982. Similarly undisputed is the fact that P & G has applied for two additional trademarks covering the trade dress of the Head & Shoulders packaging.

■ After reviewing all of the exhibits, the motion papers, and after hearing oral argument, this Court finds that the defendants used a counterfeit of P & G's trademark for the name "Head & Shoulders" in connection with the sale of goods in commerce. First, it is undisputed that the shampoo contained in the 30,000 bottles bearing the Head & Shoulders label is not genuine Head & Shoulders. P & G presented Caldwell's affidavit which specifically outlines the ten tests that P & G performed on the liquid contained in the alleged "Head & Shoulders" bottles that Kroger had purchased from Quality King. Caldwell describes how the liquid did not contain even 50% of the active ingredient present in genuine "Head & Shoulders." The plaintiff also presented Alam's deposition, in which she describes how she diluted and altered P & G waste and combined other companies waste with blue coloring to fill 30,000 bottles with blue dandruff shampoo.

Caldwell's affidavit also addresses the manner in which the bottles and labels are different from genuine "Head & Shoulders" bottles. For instance, the counterfeit bottles bear the name, "Head & Shoulders," but that label is fake because it is paper; the writing is in a typeface that P & G does not use; and the numeric code printed on every genuine Head & Shoulders label is absent. The bottles are impostors because their shape had been discontinued nine years earlier; their texture was rough when it should have been smooth; their caps were not the leak-proof flip-top caps used by P & G; and identification codes were not embedded in them.

In the face of all this clear and detailed evidence demonstrating how the 30,000 bottles of shampoo bore the Head & Shoulders trademark name but did not contain genuine Head & Shoulders, the defendants state only that they dispute the fact that the shampoo was counterfeit and assert that it raises a genuine issue of material fact. They do not offer a single fact in support of this conclusory allegation. *See Fagan,* 186 F.3d at 132; *Kulak,* 88 F.3d at 70. Accordingly, in this Court's view, it is undisputed that the shampoo was not genuine Head & Shoulders, and, thus, the bottles bearing the name, "Head

& Shoulders," were counterfeits of P & G's registered mark.

The plaintiff also introduced specific and undisputed evidence that the defendants sold the counterfeit shampoo bottles in commerce. The bills of lading and deposition testimony offered by the plaintiff conclusively show that Alam sold approximately 30,000 bottles of blue dandruff shampoo to Doubilet who sold the same to Pandullo. In turn, Pandullo sold the shampoo to Zoeller, and at the time of that transaction, the shampoo bore the fake Head & Shoulders label. Zoeller sold it to Arzillo, who sold it to the defendant Rose who operated the defendant company Omni, and Rose sold it to the defendant Quality King, which then sold it to Kroger. Because the defendants Rose, Omni, and Quality King do not challenge this evidence, this Court finds that the defendants sold counterfeits of P & G's trademark name Head & Shoulders product.

■ In addition, the evidence clearly demonstrates that the defendants used P & G's trademark "in commerce." To fulfill the "in commerce" requirement of Section 1114(1), the plaintiff must show that the defendant's " 'activities ... have a damaging effect on plaintiff's federally protected interstate business.' " *Grey*, 910 F.Supp. at 1086 (quoting *Purolator, Inc. v. EFRA Distributors, Inc.*, 687 F.2d 554, 559 (1st Cir.1982)). Where, as here, the plaintiff is a large corporation that conducts business on a worldwide basis, a presumption arises that the defendants' activities, even if intrastate, have a substantial effect on interstate commerce. *See Grey*, 910 F.Supp. at 1086 (citing *Minute Man of America, Inc. v. Coastal Restaurants, Inc.*, 391 F.Supp. 197, 200 (N.D.Tex.1975)). Thus, P & G is entitled to the presumption that the defendants' sale of the infringing Head & Shoulders shampoo bottles had a substantial effect on interstate commerce within the purview of Section 1114(1). The defendants have not, and indeed cannot, rebut this presumption. Accordingly, it is undisputed that the defendants sold counterfeits of P & G's trademark product in commerce.

Furthermore, a reasonable trier of fact could not find in favor of the defendants on the issue of likelihood of confusion. The Second Circuit has set forth eight factors that the courts should apply in addressing the issue of likelihood of confusion:

(i) the strength of plaintiff's mark;

(ii) the similarity of the parties' marks;

(iii) the proximity of the parties' products in the marketplace;

(iv) the likelihood that the plaintiff will bridge the gap between the products;

(v) actual confusion;

(vi) the defendant's intent in adopting its mark;

(vii) the quality of the defendant's product; and

(viii) the sophistication of the relevant consumer group.

*Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 46 (2d Cir.2000) (citing *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961)). None of these factors is dispositive, and courts should focus on the ultimate question of whether consumers are likely to be confused instead of mechanically finding a winner by determining which party has the most factors in its favor. *See Nabisco*, 220 F.3d at 46.

Applying these standards to the facts of this case, the Court concludes that the defendants' infringing activities created a likelihood of consumer confusion. P & G's mark is world renowned, has been in existence since 1961, and is attached to a product that is top in its market. Moreover, the defendants do not dispute the strength or the distinctiveness of the mark. *See Grey*, 910 F.Supp. at 1088. As explained above in detail, it is undisputed that the marks the defendants used in distributing the counterfeit Head & Shoulders were virtually identical to P & G's marks. The defendants clearly intended that the consuming public believe that the

mark they used was the valid and incontestible P & G mark. Moreover, the counterfeit and genuine products were both dandruff shampoo, and the counterfeit product was placed on shelves where the genuine product was displayed. Consequently, anyone looking at the counterfeit shampoo would likely be confused as to its true source. In fact, consumers who were actually confused by the counterfeit, and who bought it and were dissatisfied with it, were the people who alerted P & G to the possibility of counterfeit or substandard Head & Shoulders.

"Where, as here, the goods distributed by the [d]efendants are intentional copies and virtually identical to the trademark owner's goods, likelihood of confusion may be established at the summary judgment stage." *Grey,* 910 F.Supp. at 1088; *see Polo Fashions, Inc. v. Craftex, Inc.,* 816 F.2d 145, 148 (4th Cir.1987) ("Where ... one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion."). As one court stated:

> [i]t would be difficult to imagine a clearer case of consumer confusion than the instant case in which defendants, acting in direct competition with the plaintiff, sold counterfeit products on which plaintiff's registered marks appear in their entirety. Under these circumstances, the likelihood of consumer confusion, mistake or deception is clear.

*Microsoft Corp. v. CMOS Technologies, Inc.,* 872 F.Supp. 1329, 1335 (D.N.J.1994). Accordingly, this Court finds, as a matter of law, that by distributing fake Head & Shoulders in impostor discontinued Head & Shoulders bottles which bore the plaintiff's trademark, the defendants created a likelihood of confusion as to the source of the shampoo. *See Monsanto Co. v. Haskel Trading, Inc.,* 13 F.Supp.2d 349, 359 (E.D.N.Y.1998). In sum, the defendants violated 15 U.S.C. § 1114(1), and P & G is entitled to judgment as a matter of law on the issue of liability under that statute.

## C. The Defendants' Cross–Motion for Summary Judgment

### 1) Unclean Hands

█ The defendants argue that P & G's motion for summary judgment should be denied and their cross-motion for summary judgment should be granted because P & G had unclean hands. According to the defendants, P & G either knew that Ianco was reselling bastard products for human use or knew that Ianco was reselling bastard products as genuine ones, but allegedly failed to police Ianco's activity. Thus, the defendants' argument concludes, P & G has unclean hands and is estopped from obtaining relief under the Lanham Act.

"Unclean Hands is a defense to a Lanham Act infringement suit. To prevail ... [e]quity requires that those seeking its protection shall have acted fairly and without fraud or deceit as to the controversy in issue." *Levi Strauss & Co. v. Shilon,* 121 F.3d 1309, 1313 (9th Cir.1997); *see Warner Bros. Inc. v. Gay Toys, Inc.,* 724 F.2d 327, 334 (2d Cir.1983); *Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F.Supp. 1339, 1355 (E.D.N.Y.1994) (holding that section 32(b) of Lanham Act "denies even an incontestable registrant the benefit of their trademark where that party's use of the mark is tainted with inequity or bad faith"). However, the defendants cannot raise the defense of unclean hands to all of the plaintiff's alleged inequitable conduct. *See Gidatex v. Campaniello Imports, Ltd.,* 82 F.Supp.2d 126, 131–32 (S.D.N.Y.1999); *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.,* 13 F.Supp.2d 430, 445 (S.D.N.Y.1998). "[T]he defense of unclean hands applies only with respect to the right in suit." *Warner Bros. Inc.,* 724 F.2d at 334; *see Liz Claiborne, Inc.,* 13 F.Supp.2d at 445; *Computer Associates Int'l v. Bryan,* 784 F.Supp. 982, 997 (E.D.N.Y.1992) ("[T]he doctrine of unclean hands is only applicable when the conduct relied on is directly related to the subject matter in litigation—in this case meaning

that it would have to be related to the creation or acquisition of the trade secrets themselves."). In this case, the doctrine of unclean hands must relate to the creation or acquisition of the trademark itself. *See Gidatex*, 82 F.Supp.2d at 131–32; *Liz Claiborne, Inc.*, 13 F.Supp.2d at 445; *Computer Associates*, 784 F.Supp. at 987; *see also Warner Bros. Inc.*, 724 F.2d at 334. Here, the defendants did not allege, much less prove that P & G engaged in inequitable conduct in the gaining or the use of the trademark rights it seeks to enforce. Accordingly, the Court finds that the defense of unclean hands is inapplicable to this case.

### 2) Abandonment

■ The defendants also claim that P & G abandoned its trademark of the name "Head & Shoulders" because P & G "knowingly and purposefully gave Ianco the right to use its trademark on substandard product" (Quality King's Memorandum, p. 13). According to the defendants, P & G authorized Ianco's use of P & G's trademark because the liquidated damages clause in the recycling contract between P & G Canada and Ianco provided no penalty for violating the contract's ban on trademark use other than being charged the normal wholesale price of the product.

■ An uncontrolled license may provide the basis for an inference of abandonment of a trademark. *General Motors Corp. v. Gibson Chemical & Oil Corp.*, 786 F.2d 105, 110 (2d Cir.1986); *Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F.Supp. 1339, 1354–55 (E.D.N.Y.1994) ("A mark may be deemed abandoned by virtue of an assignment in gross."). Indeed, an incontestable mark may be deemed abandoned when the registrant licenses the mark and fails to police the license. *See Warner Bros. Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir.1983). However, to succeed on such an abandonment claim, the defendant must meet a "high burden of proof." *Id.* After the mark is deemed abandoned, it reverts to the public domain where anyone can appropriate it for their own use. *See Dial–A–Mattress*, 841 F.Supp. at 1354–55. Here, the defendants' argument that P & G licensed their mark to Ianco by including the liquidated damages provision in the recycling contract fails for two reasons.

First, the explicit language of the contract and Kalifon's deposition testimony show that no reasonable juror could conclude that P & G waived its right to sue for trademark infringement by including a liquidated damages provision in the contract. The contract language clearly and expressly prohibited Ianco or any other party or individual from "mak[ing] reference to Procter & Gamble or any of our product brand names, trademarks, logos or designs" (Recycling Agreement, ¶ 2). After the liquidated damages provision, the contract further stated that Ianco must modify the identity of any product it resells so that the source is not easily recognized (Recycling Agreement, ¶ 5). Moreover, nowhere in the contract does P & G expressly or impliedly state that the liquidated damages clause constitutes P & G's sole recourse if Ianco or a subsequent purchaser infringed one of the company's trademarks.

Furthermore, Kalifon, the owner and operator of Ianco, testified in his deposition that P & G told him that if he resold the waste materials given to him by P & G, he must "bastardize" the product by adding water, color, or an odor so that the resultant product did not look, smell, or feel like a product manufactured by P & G (Kalifon Deposition, p. 42–43). Kalifon stated that P & G made it clear to him that if he resold their waste, he must alter the product in such a manner that P & G's identity was a secret (Kalifon Deposition, p. 43). Given the clear language of the contract and the undisputed testimony of Kalifon, no reasonable juror would conclude that P & G waived its trademark rights by including a liquidated damages provision in the contract with Ianco.

Second, the liquidated damages clause is an alternative theory of recovery for P. & G, not a license to Ianco for the use of the Head & Shoulders trademark. The liquidated damages provision states that if Ianco referred to P & G or any of P & G's product brand names, trademarks, logos, or designs in Ianco's subsequent handling of P & G's waste products, P & G would charge Ianco the normal wholesale rate for the product. P & G has not charged Ianco the normal wholesale rate for the product, and Ianco has not paid P & G that money. That P & G has not attempted to collect the normal wholesale rate for the counterfeit shampoo from Ianco and instead has filed this lawsuit further demonstrates that the liquidated damages provision is merely an alternative theory of recovery, not a license to Ianco for the use of P & G's tradmark. Given that the defendants have failed to establish that P & G licensed the use of the Head & Shoulders name to Ianco, this Court finds that the defendants have not met their high burden of proof to establish that P & G abandoned its trademark by failing to police the alleged license.

### 3) Rose's Personal Liability

■ The defendant Rose argues that he is not personally liable for the infringing activity because he did not exceed his duties as an officer, acted in good faith, and did not have the specific intent necessary to encourage the infringing activity. A corporate official's personal liability for trademark infringement is established "if the officer is a 'moving active conscious force behind [the defendant corporation's] infringement.'" *Monsanto Co. v. Haskel Trading, Inc.*, 13 F.Supp.2d 349, 354 (E.D.N.Y.1998) (quoting *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F.Supp. 899, 913 (E.D.N.Y.1988)); *see Mattel, Inc. v. Internet Dimensions, Inc.*, 2000 WL 973745 *9 (S.D.N.Y.2000).

■ P & G's evidence demonstrates that Rose was the person who actually purchased the Head & Shoulders shampoo for Omni. Indeed, Rose testified that he was the person who was responsible for all of the companies' purchases and sales. Given the clear evidence of Rose's active conscious involvement in an activity which is the infringing activity, his argument supporting his attempt to escape individual liability as a matter of law does not hold water. *See Mattel, Inc.*, 2000 WL 973745; *Monsanto Co.*, 13 F.Supp.2d at 354.

At oral argument, defendant Rose relied on *Manville Sales Corp. v. Paramount*, 917 F.2d 544, 553 (Fed.Cir.1990), in support of his assertion that he cannot be held personally liable for the infringing activity because he did not know that the bottles of shampoo did not contain Head & Shoulders. In *Manville*, the Court of Appeals held that in a patent case, brought under 35 U.S.C. § 271(b), "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements." *Manville*, 917 F.2d at 553. The Court therefore reversed as to the liability of some of the defendants in their individual capacity, because the plaintiff failed to introduce any evidence or findings that the officers had "specific intent to cause another to infringe." *Id.* at 554.

Contrary to defendant Rose's assertions, that holding is inapplicable to the case at hand, because *Manville* involved a patent infringement and 35 U.S.C. § 271(b), whereas the instant case involves trademark infringement and 15 U.S.C. § 1114(1). Moreover, *Manville* does not stand for the proposition that the plaintiff must prove that the defendant knew that the products he was purchasing were counterfeits. The Court of Appeals clearly stated that the plaintiff has the burden of showing that the defendant "knew or should have known" that he was dealing in counterfeit goods *Id.* at 554. Even if the rule set forth in *Manville* applied to this case, P & G has met its burden by presenting the transcript of Rose's deposition in which he testified that he he purchased

the shampoo for approximately $1.70 per bottle, when the list price for the product was roughly $2.75 per bottle. Thus, though it is not required to do so under the Lanham Act, P & G has offered evidence that Rose should have known that he was purchasing counterfeit Head & Shoulders.

### III. *CONCLUSION*

Having reviewed the parties submissions and having granted them the opportunity for oral argument, it is hereby

**ORDERED,** that the plaintiff's motion for summary judgment as to the issue of defendants' liability for trademark infringement in violation of 15 U.S.C. § 1114(1)(a) is **GRANTED;** and it is further

**ORDERED,** that defendants's cross-motion for summary judgment on the theories of unclean hands, abandonment, and lack of individual liability is **DENIED;** and it is further

**ORDERED,** that counsel for all parties are directed to select a jury on Tuesday, January 16, 2001, at 9:00 a.m.

SO ORDERED